**Reuben KOCH, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Feb. 18, 1955.

Rehearing Denied June 22, 1956.

Harry J. Luedeke and Benton, Benton & Luedeke, Newport, for appellant.

J. D. Buckman, Jr., Atty. Gen., Wm. F. Simpson, Asst. Atty. Gen., for appellee.

STANLEY, Commissioner.

The appeal, by motion, is from a conviction of assault and battery with imposition of a penalty of confinement in jail for six months and a fine of $5,000. The case is not the usual one of this class where the battery was done with violence and resulted in physical injury. However, the indictment charged and the instructions submitted the element of violence with the result of "great frights, scare and hurts." The real accusation and the trial was and is of what is embraced in the class known as common law aggravated assaults. Such an assault is now a statutory felony, namely, indulging in indecent and lustful liberties with the body of a child. KRS 435.105. See Wharton's Criminal Law, Sec. 799;

2 Bishop's Criminal Law, Sec. 28; Hatchett v. Blacketer, 162 Ky. 266, 172 S.W. 533.

The appellant, Reuben C. Koch, contends several reversible errors were committed. But we reach only one of them under our disposition of the case. Since the question is principally one of fact, an extended recitation of the evidence seems proper and necessary.

There is but little contradiction in the evidence of the antecedent and accompanying events of the immediate physical act upon which the prosecution rests. The question is whether there was proof from which it could be reasonably inferred that the conduct of the accused was with an evil, lustful intent, for that is an essential element of the offense. If there was such specific purpose of gratification of a sexual impulse, then the act is condemned by the law as well as by every sense of morality. There was no evidence of corporal injury or even of fright, and only meagre opinion testimony of the mother (of little probative value) of the child's later mental disturbance.

The appellant, Reuben C. Koch, sixty-seven years old, has lived in Fort Thomas since 1930. He is a building contractor and has an office and shop on Lindsey Street in Newport. He is chairman of the program committee of one of the leading churches in Fort Thomas. He has been active in charitable and religious affairs from his youth. It was established by many witnesses of high standing that for many years he has had a special interest in orphaned and needy children, whom he has helped and for whom he has made life more pleasant in a substantial and material way. He kept ponies and carts for his grandchildren, and children of the community congregated at his home and big yard. Many had been brought there from Newport to enjoy the ponies.

Mr. Koch was specially concerned about the poor children around his Newport shop. They often came there to play in the sawdust and sandpiles. He had put up a shower or spray in the yard for them. In his activities of gathering up these poor children of the neighborhood to take them to Sunday School and in distributing charity next door, he became acquainted, about two years before the event to be told, with Mrs. Alice Stone, who lived with her four little children in one room between the railroad tracks and the river, adjoining a coal yard. One of these children, Charlotte, eight and one-half years old, was the alleged victim of this charged lustful and indecent act.

Mrs. Stone testified to Mr. Koch's different and repeated acts of kindness. He had often furnished her family with food, shoes and clothing and brought them water when the cistern went dry. He had taken her and her children and others riding in his truck or station wagon and his automobile. Frequently her children, and sometimes she, had been taken to his home in Fort Thomas. It was almost a weekly practice for him to go to the home of the paternal grandmother of two of her children to receive for her money which their father left for their maintenance. It seems to have been the custom for her children to go with him and visit their grandmother. On these and other automobile trips, Koch was often accompanied by his wife and sister-in-law, who lived with them. Mrs. Stone knew the children frequented the shop. She denied knowing that he had bathed the children there, but admitted that on one occasion she had given him clean clothing to put on them. Mrs. Stone's humble home in the slums had no sanitary or bathing facilities. A cistern in the back yard and the nearby river supplied them and other people with water.

The child, Charlotte, testified to many and varied acts of kindness, including visits to Koch's home with other children to ride the ponies. He and his wife had given her baths there. And she related he had bathed her in warm water "in a little tub" a few times over his carpenter's shop. This had been done for about two years, or ever since she had known him. The references in the record are merely to "children" without any specific question about boys. But Charlotte testified her

twelve-year old brother, Joseph, was sometimes with her.

The testimony of Charlotte's sister, Dorothy, and another girl, twelve years old, was to the same effect, although with some variations.

The witnesses introduced by the defendant amplified his benevolent activities and interest in the welfare of children.

The defendant testified that he often was at his office over his shop in the evening to plan the next day's work and keep his records. He had had his shop and office at that location for twenty-five years. He described the frequent visits of the children of the neighborhood. His place was the only playground they had. He did not deny having occasionally bathed these children there and at his home when they wanted a bath. On other occasions Mrs. Stone had told him she wanted the girls "to wash at the shop," but he denied any indecency at any time. They sometimes bathed themselves. Sometimes he would wash their faces. Concerning his intentions, he declared: "I can say from the bottom of my heart I never had any more of an evil thought about these children than Christ did when he took little children in His arms."

We come to the events of the evening on which the alleged offense was committed.

Mrs. Stone testified that she had called Mr. Koch's home that afternoon to ask whether he would go after her alimony and learned that he would. He stopped by for the children. His sister-in-law was with him, and she visited a friend along the way. Mrs. Stone testified she had been at work all day and told him she had not had time to "clean up the kids." Koch testified that on the way Charlotte said to him: "Mom said I should get cleaned up at the shop." Her little sister corroborated his evidence. He had bathed the children there on previous occasions at the mother's request. Enroute, on Dorothy's request, he picked up Virginia Anent, twelve years old. She brought her school books to the office,

as she had done before, to have Koch help her with her lessons. Charlotte testified that it was Mr. Koch who suggested giving her a bath. Further: "He took my clothes off and stood me on a stool and he washed me and then he put his fingers where I wet." "Then he dried me and put my clothes on and then the police came." While he was giving her the bath he had said, "You are my little girl" and "hugged me and patted me." She indicated it was on her leg above the knee.

Charlotte's year-younger sister, Dorothy, told about Koch's bathing Charlotte and that he asked her if she wanted a bath and she told him no. Virginia Anent was in the room doing her lesson home work. She also told Mr. Koch she did not want a bath. He had bathed both of these children there on other occasions but not often.

In the details, as was natural, these little children were somewhat variable and contradictory. Their testimony exemplifies Wigmore's comment concerning the trustworthiness of young children. He wrote, "The courts must recognize on the one hand the childish disposition to weave romances and to treat imagination for verity, and, on the other, the rooted ingenuousness of children and their tendency to speak straightforward what is in their minds." Wigmore on Evidence, Sec. 509.

The suspicion of a woman living across the street from the Koch shop had been aroused by the presence of numerous children around there. About three weeks before the occasion, about the same hour of the evening (seven-thirty), she had seen a little girl upstairs without any clothes on. This led her to confer with a juvenile court officer. On this evening she saw a naked child up there with Koch, and, pursuant to arrangement, called the chief-of-police. The room was fully lighted and the window blinds were up.

When police officers arrived, Koch invited them in. They found him and the three little girls, fully dressed. He readily accompanied the officers to headquarters and the little girls went along.

The next day Mrs. Stone took the child to a doctor for examination. He found no kind of injury. It is not quite clear but we gather it was on that day that she saw Charles E. Lester, an attorney. Three or four days later she swore out a warrant for Koch, and not long afterward Lester filed suit for $25,000 damages against Koch in behalf of the mother as next friend of the child. Here is a dark shadow in the picture. We see a bad motive in it.

Character witnesses used superlatives in testifying to the defendant's reputation and code of life. They were his neighbors in Ft. Thomas and men and women living near his shop in Newport.

So reads the record.

From that record—without contradiction on the material facts—must be deduced the nature of the accused's intent. Motive or intent is an inferential fact. An evil intent as an element of a crime may be inferred from the overt act itself, but such wrongful intent may be and is often removed by the circumstances attending the act.

The light of the circumstances thrown upon the immediate event upon which this charge is based dispels the dark implications of sordid misconduct. It reveals a kind man, though indiscreet, doing a good deed. It followed a pattern of years of affection and helpfulness of these and other unfortunate children. That pattern is a badge of innocence of purpose to defile the body of this child in order to gratify some peculiar lust sometimes found in men of a depraved or vile nature. Evidence of good character strengthens the presumption of innocence. It tends to induce the belief from the improbability that such person would have a base or evil purpose.

This kind of a case—the charge of defiling the body of a little girl—naturally engenders resentment. We observe that this jury was composed of eleven married women and one man. Doubtless, they thought it to be grossly improper for a man even to bathe a little girl. But the man must be judged by his motive. We must look at the record with all its inferences and implications dispassionately and through the eyes of judicial training and experience. Where the facts of a given case themselves afford opposing presumptions of equal weight—of depravity of mind or innocence of purpose—the scale should predominate on the side of innocence.

It is axiomatic that it is the province of the jury to weigh conflicting evidence and decide the facts. A suspicion or even a well-founded belief of this court that upon such evidence justice has not been attained is not sufficient to authorize a reversal of the judgment. But cases are sometimes presented in which the verdicts are so contrary to the conclusions to which a rational judicial view of the record leads that it is proper and just to reverse the judgment. The point of review is the reasonableness of the inference of a criminal intent, which is the gravamen of the case. We are of opinion that the verdict is flagrantly against the evidence as judged by the law.

The motion for an appeal is sustained and the judgment is reversed.

CAMMACK and MONTGOMERY, JJ., dissenting.