THE STATE OF OHIO, APPELLEE, *v.* WALLEN, APPELLANT.

28

*Mr. David D. Dowd, Jr.,* prosecuting attorney, for appellee.

*Mr. Ralph W. Ross,* for appellant.

GRAY, J.   This cause is in this court on appeal on questions of law from two verdicts and judgments thereon of a three-judge trial court of Stark County finding defendant guilty of the felony murder and the premeditated murder of Harold "Smiley" McCully.

The defendant, feeling aggrieved by this result of his trial, filed his notice of appeal and assigns the following errors:

"1. The verdict and judgment of the three judge panel in regards to count number one (1) as contained in said indictment is contrary to law and against the manifest weight of the evidence.

"2. The verdict and judgment of the three judge panel in regards to count number two (2) as contained in said indictment is contrary to law and against the manifest weight of the evidence.

"3. The trial court erred in not sustaining a motion of the defendant-appellant made at the close of the state's case to withdraw from consideration of the panel, murder and a perpetration of the robbery and murder in the first degree.

"4. The trial court erred in overruling objections made by the defendant-appellant during the redirect examination of the state's witness, Norma Jean Murray, which was prejudicial to the rights of the defendant-appellant.

"5. The panel of judges erred in sentencing the defendant-appellant to death in the electric chair on two separate counts which constitutes cruel and inhuman pun-

ishment according to the Constitution of the state of Ohio.''

From the nature of the assignment of errors it will be necessary to develop the facts fully. Defendant was thirty-two years old at the time of his trial. Previous to his conviction he had served ten years in the Marine Corps and at the time of conviction was serving his fifth year in the U. S. Army. He had the rank of sergeant. He had arrived in the United States on February 7, 1968, from Vietnam where he was stationed. He was due to report at Fort Dix on March 18, 1968. He was granted leave to visit his wife and two children in Coshocton, Ohio. When he arrived there he could not locate them. On March 1, 1968, in Coshocton, he became acquainted with Norma Jean Murray, aged 30, the mother of five children. Defendant and Mrs. Murray made their way to Canton, Ohio. There they met Harold ''Smiley'' McCully, the victim in this murder case. The record shows that Mrs. Murray had known him previously.

McCully invited them to stay at his apartment. Defendant and Mrs. Murray occupied one of the bedrooms. The record discloses that the victim was employed at Republic Steel and had furnished lodging, food and alcoholic beverages for his nonpaying guests.

On April 11, 1968, defendant, Mrs. Murray and McCully were drinking in the Nu Way Grill in the city of Canton. The victim went to the paymaster's office of Republic Steel, picked up his pay check in the sum of $76.89, cashed it and returned to the Nu Way Grill.

They had more drinks at the grill. The two men got into an argument over Mrs. Murray. Eventually things quieted down. The victim bought a six-pack of beer, and the three went to his apartment which was nearby.

After arriving at the apartment, they drank some of the beer. Defendant and McCully got into another argument over Mrs. Murray. Mrs. Murray went to the bathroom. When she returned she saw defendant hit ''Smiley,'' knocking him off the chair. ''Smiley'' landed on the floor. Defendant started to kick the victim. ''Smiley'' was badly beaten. Defendant then wrapped a TV lead-in wire around the victim, effectively trussing him in a doubled-up position.

Defendant picked up the victim's pocketbook, took some money from it, grabbed Mrs. Murray by the arm and took her suitcase. After some wanderings, defendant and Mrs. Murray were observed by Officer Fink of the Fairfield Police Department, Butler County, Ohio, on April 26, 1968, walking along the berm of Ohio Route No. 127. Officer Fink accosted them. They identified themselves as Mr. and Mrs. William C. Wallen. Upon request for identification, defendant produced a Honolulu driver's license. Defendant and Mrs. Murray were permitted to board a passing bus. Officer Fink relayed the information contained on the driver's license to the police dispatcher, who ran a check. It was determined that defendant and Mrs. Murray were wanted by the Canton police for investigation of a homicide. The patrolman tried to overtake the bus. While traveling south on route 127, he observed the defendant and Mrs. Murray walking along the roadside. They were arrested and returned to Stark County for prosecution.

The above version concerning the events of April 11, 1968, was that narrated by Norma Jean Murray, who testified as a state witness. Defendant testified in his own behalf, and his version is in conflict with that of Mrs. Murray in some important respects.

Defendant states that on April 11, 1968, after returning from the Nu Way Grill, they were drinking beer at the victim's apartment when defendant and McCully became involved in an argument over Norma Jean. Defendant claims the deceased hit him first. Defendant testified as follows:

"Well the man wanted me to leave and leave the girl there with him. He said he had a nice deal or something for her. We came to know the man hustled at the bar and I didn't appreciate it.

"* * *

"A. I was sitting there drinking a beer. The man [McCully] hit on me again about leaving the girl and he had something for her to do, and so I kind of thought about it and the next thing the man pulled out his wallet and sat

it on the table and said, 'I will give you $50.00 if you leave the girl now and go about your business,' and I told him I wouldn't leave the girl. The next thing I know I am on the floor.

"Q. You say he pulled out his wallet? A. Yes sir.

"Q. What did he do with it? A. Laid it on the table.

"Q. What did he say? A. Offered me $50.00 if I would leave.

"Q. To leave the apartment? A. To leave the apartment and leave her there.

"* * * *

"Q. And are these the boots that have been introduced in evidence? A. Yes, sir, they are.

"Q. All right, do you recall at any time kicking Mr. McCully? A. No, I don't sir. All I know was hands flying. I really can't say. I don't know.

"Q. Then what happened? A. Well, the next thing I know somebody was tugging on me and pulling on me and I turned around and there was Norma Jean. All I did was turn-ah-turn around and I looked and saw the man's wallet and took the $50.00 and left and grabbed the girl and went down to the street.

"Q. When you left was Mr. McCully living, do you know? A. Yes, he was—he was conscious.

"Q. Was he breathing? A. Yes, he was.

"Q. All right, and after you left where did you go? A. I left and went on down to the bus station and went to Steubenville because I didn't want any more trouble.

"Q. And did you know that Mr. McCully had died? A. No, sir, I didn't.

"* * * *

"Q. All right now you say this man wanted to hustle this girl? A. That is correct.

"Q. What did he tell you about that? A. He wanted me to leave because he wanted to put her on the street to make a little money for him.

"Q. When did he first tell you that? A. He mentioned it three or four times.

"* * * *

"Q. Didn't say anything to her about this? A. I can't recall.

"Q. Didn't you sleep with this woman every night? A. Yes.

"Q. And didn't you consider her to be your girl friend? A. Right.

"Q. And you didn't like this, did you? A. I didn't like the part about putting her on the street."

On cross-examination, defendant denied trussing up the victim with wire or that he kicked him.

Dr. Gus Shaleen, Stark County Coroner testified as to the results of an autopsy conducted upon the body of Harold McCully.

His opinion as to the cause of death of Harold McCully was that he died of acute respiratory arrest due to the lung damage caused by multiple rib fractures. From the blows delivered to the ribs the lungs became congested. The tissues and blood vessels were loaded with blood, and the lungs could not function in exchanging the respiratory gases in and out of the lungs.

McCully's face was swollen, and there were eight stab wounds on the right side of the skull.

The coroner testified further that the body of the victim was tied by seven-strand TV lead-in wire. The victim's shirt was tied about his neck, and a knot in the shirt was located in front of his neck. The coroner was of the opinion that the damage to the rib cage was done by blows from fists or by kicks.

The record shows that McCully was required to move on April 11, as a new tenant was to occupy his apartment. He was required to move because he didn't pay his rent. This threatened to eliminate free board, room and alcoholic beverages for defendant and Mrs. Murray.

The "morning report" of Company D, Second Battalion, 18th Infantry, of which defendant was a member, shows that he was A. W. O. L. as of March 18, 1968. He had no money. He had no clothes except what he was wearing. Mrs. Murray had one suitcase with clothes in it.

Defendant forcefully urges to this court that *there is no evidence* in this case of any intent, plan or scheme of

the defendant to have intended to perpetrate or attempt to perpetrate robbery. There can be no question from the evidence that defendant took money from the pocketbook of McCully after the fight. Defendant contends that he formed the intent to take the victim's money after the fight that resulted in the death of McCully, and that the *mens rea* necessary to constitute a robbery and the physical assault did not coincide. Therefore, he contends, he was not guilty of a felony homicide or a premeditated homicide. It is defendant's contention that he had the fight with the victim because he wished to protect Norma Jean Murray from a life of sin with the victim. At this point the court wishes to observe that defendant does not attempt to explain what he thought his relations with Mrs. Murray amounted to when he slept with her every night for a period of two months and considered her "his girl friend." This relationship existed when both were married to other spouses.

We are now required to determine whether the necessary intent existed at the time the homicide and robbery took place.

Intent as an element of an offense may be implied from established facts.

The defendant strenuously urges that premeditated murder was not proved. Let us look at the record. The victim was badly beaten. He was literally kicked to death. The intent and malice aforethought can readily be inferred from the deliberate and cruel acts which show an abandoned, evil and malignant heart.

The facts surrounding the victim's death have been related hereinbefore and will not be repeated here. The defendant, in order to insure the success of the robbery, left "Smiley" bound, helpless and gagged. He also left the radio playing loudly, locked the door of the apartment, and took a bus for Steubenville.

A woman in an adjacent apartment heard muffled noises for several hours from the apartment in which the victim died. During that period of time defendant had the opportunity to return and to free the victim of his bonds and call medical aid. Instead, defendant fled the scene of

the crime and was not heard from for a period of two weeks, when he was apprehended by law officers. Nothing in the record shows that during his flight of two weeks, or upon apprehension, defendant was interested in the slightest degree in the victim's well being.

When defendant did not abandon his purpose before the victim died, he affirmed his previous acts and decision to rob and kill McCully.

This case was presented to a three-judge court. There was substantial and more than ample evidence upon which the court could base its decision. The issue is, therefore, one for determination by the trier of facts. *State* v. *Antill,* 176 Ohio St. 61, paragraph five of syllabus.

When the evidence in a criminal case tends to sustain all the essential elements charged in the indictment, it is error for the trial court to withdraw the case from the jury and discharge the defendant. *State* v. *Axe,* 118 Ohio St. 514; *Painesville Utopia Theatre Co.* v. *Lautermilch,* 118 Ohio St. 167; *Cooper* v. *State,* 121 Ohio St. 562.

We hold that the trial court was not in error in refusing to direct a verdict in defendant's favor.

The trial court found defendant guilty on both counts of the indictment. If there is any substantial evidence to support the decision of the trial court, we must affirm such decision. *In re Tilton,* 161 Ohio St. 571, 577. We are not permitted to substitute our judgment for that of the trial court, even if we were disposed to do so. Let it be said that we find no fault with the decisions of the trial court. *Trickey* v. *Trickey,* 158 Ohio St. 9, 14. We specifically find that there was substantial evidence to support the judgment of the trial court in finding defendant guilty on the two counts of the indictment and in not recommending mercy.

The accused is presumed to know and to intend what he does.

A guilty intent may be established from inferences reasonably drawn by the jury from facts which have been proved beyond a reasonable doubt, including acts and statements of a defendant. *State* v. *Gatewood,* 169 Kan. 679, 221 P. 2d 392; *State* v. *Johnson,* 74 Idaho 269, 261 P. 2d 638; *Koch* v. *Commonwealth* (Ky.), 290 S. W. 2d 783; 21 Ameri-

can Jurisprudence 2d 162, Criminal Law, Section 81; 22 Corpus Juris Secundum 118, Criminal Law, Section 33.

While objective facts may be proved directly, the state of a man's mind must be inferred from the things he says or does. *American Communications Assn.* v. *Douds,* 339 U. S. 382, 411, 94 L. Ed. 925, 70 S. Ct. 674; *United States* v. *Remington* (C. C. A. 2), 191 F. 2d 246, 249.

Criminal intent is usually a question of fact for determination by the jury and can be inferred from facts and circumstances reasonably tending to manifest a mental attitude. *Morissette* v. *United States,* 342 U. S. 246, 274, 276, 96 L. Ed. 288, 72 S. Ct. 240. In determining the sufficiency of the evidence to sustain a conviction, an appellate court is confined to the question of law whether, viewing the evidence in the light most favorable to the prosecution, there is substantial evidence, either direct or circumstantial, which, together with the reasonable inferences to be drawn therefrom, sustains the verdict. *Reynolds* v. *United States* (C. C. A. 10), 289 F. 2d 698; *Travis* v. *United States* (C. C. A. 10), 269 F. 2d 928, 936, reversed on other grounds, 364 U. S. 631, 5 L. Ed. 2d 340, 81 S. Ct. 358; *Corbin* v. *United States,* 253 F. 2d 646, 649. In the case at bar there is substantial evidence, set forth in full above, from which a reasonable inference of criminal intent may be drawn.

The Supreme Court, in the case of *State* v. *Robinson,* 161 Ohio St. 213, said, in the sixth paragraph of the syllabus:

"Where the fact of killing is proved, malice is to be presumed, and all the circumstances of justification, excuse, or extenuation must be made by the accused, unless they appear from the evidence adduced against him."

The first three assignments of error are, therefore, overruled.

The prosecution, over objection of defendant, was permitted to put leading questions to Norma Jean Murray. Defendant contends that this ruling of the trial court caused prejudicial error to occur and left the innuendo or suggestion that the motive for taking the money was that both he and Mrs. Murray were broke.

Defendant was tried by a three-judge court. It is pre-

sumed that the court considered only the relevant, material and competent evidence in arriving at its judgment. *State v. White,* 15 Ohio St. 2d 146.

The allowance of or refusal to allow leading questions in the examination of a witness must, very largely, be subject to the control of the court in the exercise of sound discretion. *Evans v. State,* 24 Ohio St. 458. The existence in the court of such discretion is fundamental and is generally recognized. We hold that there was no abuse of discretion in this instance.

That assignment of error is overruled.

Defendant, in his fifth assignment of error, claims prejudicial error occurred when defendant was charged with two counts of first degree murder although only one person was killed. One count charged defendant with a felony homicide. The other count charged defendant with premeditated homicide. The three-judge court returned a verdict of guilty and withheld mercy on both counts. Defendant now contends that the trial court erred in returning "two verdicts of guilty of first degree murder when only one general verdict could have been returned, and in imposing two sentences for the commission of but one crime."

The Supreme Court of Ohio has often held or stated that the fact that a defendant has been put in jeopardy upon a trial for one criminal act is no bar to a prosecution for a separate and distinct criminal act merely because such acts are closely connected in point of time, place and circumstances; that the words "same offense" mean same offense, not the same transaction, not the same acts, not the same circumstances or same situations; and that it is not enough that some single element of the offense for which the defendant had theretofore been in jeopardy is the same, but the constitutional provision requires that it shall be the "same offense." *Dodge v. State,* 124 Ohio St. 580, 81 A. L. R. 699; *Duvall v. State,* 111 Ohio St. 657; *State v. Rose,* 89 Ohio St. 383, L. R. A. 1915A 256; and *Mitchell v. State,* 42 Ohio St. 383.

We conclude that if the offenses charged are separate and distinct, either with respect to statutory definition or

because, as charged, they grew out of different transactions and different evidence is needed to prove each, then the constitutional inhibition against double jeopardy is not applicable and, so long as the offenses charged are not factually inconsistent, a defendant may be found guilty and judgment of sentence thereon may be had as to each of the offenses charged. See *State* v. *Ferguson*, 175 Ohio St. 390, 394, 395.

Defendant makes the further contention that a cruel and unusual punishment was inflicted upon him when he was sentenced to death twice.

The state of Ohio by law would carry out the death penalty by exposing the convict to a charge of electrical current. This has been held not to be cruel and unusual punishment for a condemned person. *In re Kemmler*, 136 U. S. 436, 34 L. Ed. 519, 10 S. Ct. 930.

While defendant was sentenced to death twice, he could only pay the penalty once.

The Supreme Court has spoken on this subject in *McDougle* v. *Maxwell, Warden*, 1 Ohio St. 2d 68, wherein it is said:

"It is generally accepted that punishments which are prohibited by the Eighth amendment are limited to torture or other barbarous punishments, degrading punishments unknown at common law, and punishments which are so disproportionate to the offense as to shock the moral sense of the community. * * *"

According to the above definition no cruel or unusual punishment was ordered inflicted upon defendant.

That assignment of error is overruled.

We find no alleged error prejudicial to defendant. Therefore, the judgments of the trial court are affirmed.

*Judgments affirmed.*

VAN NOSTRAN, P. J., and RUTHERFORD, J., concur.

GRAY, J., of the Fourth Appellate District, sitting by designation in the Fifth Appellate District.