[Cite as *State v. Chafin*, 2019-Ohio-5306.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                          |   | JUDGES:                         |
|--------------------------|---|---------------------------------|
| STATE OF OHIO            | : | Hon. W. Scott Gwin, P.J.        |
|                          | : | Hon. William B. Hoffman, J.     |
| Plaintiff-Appellee       | : | Hon. Patricia A. Delaney, J.    |
|                          | : |                                 |
| -vs-                     | : |                                 |
|                          | : | Case No. 2019 CA 00014          |
| JASON CHAFIN             | : |                                 |
|                          | : |                                 |
| Defendant-Appellant      | : | OPINION                         |

CHARACTER OF PROCEEDING:     Criminal appeal from the Fairfield County
                             Court of Common Pleas, Case No.
                             2018CR377

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      December 20, 2019

APPEARANCES:

For Plaintiff-Appellant                 For Defendant-Appellee

KYLE WITT                               ANDREW SANDERSON
Fairfield County Prosecutor             Burkett & Sanderson, Inc.
239 West Main Street, Ste. 101          738 East Main Street
Lancaster, OH 43130                     Lancaster, OH  43130

*Gwin, P.J.*

{¶1} Defendant-appellant Jason Chafin ["Chafin"] appeals his conviction and sentence after a bench trial in the Fairfield County Court of Common Pleas.

*Facts and Procedural History*

{¶2} On June 10, 2018, 15-year-old L.L. went to work in the morning at a Lancaster, Ohio restaurant. L.L. had a disagreement with her supervisor and left work. L.L. could not reach her family and had no ride home. As L.L. walked home a Jimmy John's delivery driver, whom she did not know, offered her a ride. The delivery driver, Chafin, told L.L. he had to make a delivery prior to dropping her off near her home. L.L. agreed and got into Chafin's red Honda automobile.

{¶3} As Chafin and L.L. rode toward the delivery drop off, Chafin told her his name was Jason, asked how old she was, and inquired if anyone knew that she was walking home alone. After making the delivery in the Dominion Homes subdivision, L.L. recognized that Chafin was driving in the opposite direction from which they had entered the subdivision. L.L. became fearful. After Chafin pulled away from the delivery location and the car was in motion, Chafin asked L.L. if she "liked to flirt." Chafin told L.L. that she was pretty. After telling L.L. she was pretty, Chafin firmly grasped L.L.'s hand causing her to jerk her hand away to break his grip. (1T. at 103-105[1]). L. L. demanded that Chafin stop and pulled her hand away from his hand. (1T. 102, 106). When Chafin made no attempt to stop, L.L. jumped from the car. (1T. 106, 107). L.L. suffered scratches to the palms of her hand when she caught herself after the jump. L.L. testified that the car never slowed down even after she jumped from the car. (1T. 114). In fact, L.L. testified that the

---

[1] For clarity the Bench Trial that took place on March 11 and 12, 2019 will be referred to by Volume and page number as "1T." or "2T."

car sped off after she had jumped.  (1T. at 115).  L.L. recalled that she had observed a car seat, stickers and items affiliated with Jimmy John's on Chafin and displayed on the car.  (1T. 114).

{¶4}    Tracy Wentz, a resident of a subdivision built by Dominion Homes known as "River Valley Highlands," had contact with a neighbor of hers that is hard of hearing. The neighbor brought L.L. over to Wentz's residence due to the communication difficulties.  Wentz observed that L.L. had been sobbing and was breathing heavily.  L.L. explained she had taken a ride from a delivery driver who had offered to give her a ride home.  Instead, during a delivery in Wentz's neighborhood, the driver had touched L.L. and said things to her that caused L.L. to flee his car.  Wentz sat with L.L. on her porch until L.L.'s father arrived to pick her up.

{¶5}    L.L.'s father, C. S. arrived at Wentz's home.   Earlier that day C.S. had dropped L.L. off to work in the morning. When C.S. picked up L.L., he learned that a male Jimmy John's delivery driver had scared his daughter and she jumped from the car.  C.S. immediately drove to the Jimmy John's location where he asked about the delivery driver and waited in front of the store.  C.S., who is a large man, admitted he was angry but never saw any male delivery driver pulled into the location while he waited for police.  The demeanor of C.S. caused the employees of Jimmy John's to call 9-1-1.

{¶6}    Breanna Richardson was the Jimmy John's assistant manager on duty on June 10, 2018 and was working with Chafin.  Richardson encountered C.S. who arrived at the store and made a threat to the delivery driver in the red car.  Richardson called both Lori Wood and Chafin after C.S. arrived.  Lori Wood is Chafin's mother.  Jimmy John's also employed her on the date of the incident.  Richardson told Chafin to park out

back when he arrived and to call her so she could let him in the back of the Jimmy John's. Chafin inquired what was wrong and Richardson told him, "Don't worry about it." Richardson also called Wood and told her to come in to work early as she would need a driver and that the problem had something to do with Chafin. Richardson did not recall telling Wood any details regarding the allegations in her phone call to Wood. Richardson did not tell Chafin to remove or alter his Jimmy John's work uniform or to park his car in a different location.

{¶7} Valerie Gould was the general manager of the Jimmy John's restaurant and was involved in the process of hiring Chafin. During the hiring process, Gould ensured that Chafin knew he must wear Jimmy John's approved hat and shirt during working hours and that his delivery vehicle was required to display the Jimmy John's sign. The Jimmy John's driver policy banned drivers from picking up any passenger. Gould confirmed that Jimmy John's employs an order tracking system and that during the shift of Chafin on June 10, 2018 he made two separate deliveries to a location of 2602 Two Ridge Avenue in the Dominion Homes subdivision. Gould explained that Chafin remained employed with Jimmy John's after June 10, 2018 and had explained the situation to her as a "misunderstanding."

{¶8} Lori Wood, Chafin's mother, confirmed that she had received a phone call from Richardson on June 10, 2018. Wood confirmed she, her son Chafin, and a daughter were all employed at Jimmy John's. Wood also confirmed that on the date of alleged offense Chafin had told her not to worry because he had, "done nothing wrong." (1T. 208). Wood was also questioned if she had any later conversations with her son about the events during a recorded call with Detective Underwood. Specifically, within the call

Wood reported Chafin told her, "He said he had offered her a ride. He told her that he had to make a delivery. She said that was fine. He made his deliver. He was on his way out of the housing complex and she said she didn't feel comfortable. And he said to give him a minute. He was pulling over to let her out and she tried to get out. And he didn't want her to get hurt, so he tried to stop her from jumping out right before he stopped. And she got out and he came back — he went on about his — went back to the store, got his delivery. He made his delivery to the mall, and then I called him and stopped him from going to Crestview." (1T. 223-224). Although the context of the question from Detective Underwood was, "Did you talk with Jason again?" Wood asserted at trial she had received some of the information from another son, Kelly, who is a Morgan County Sherriff's deputy. (1T. at 243).

{¶9} On June 10, 2018 at approximately 12:21 p.m., Officer David Thompson of the Lancaster Police Department responded to a dispatch for the Jimmy John's restaurant at 1804 Memorial Drive. He contacted L.L. and her father outside in front of the store. Officer Thompson learned that L.L. was alleging something had occurred between her and a male Jimmy John's delivery driver. Officer Thompson observed that L.L. was visibly shaken and had a slight injury to her hand. Officer Thompson entered the Jimmy John's storefront looking for a male employee but seeing no males made contact with two female employees. Officer Thompson learned that C.S. had previously entered the Jimmy John's and as a result, the female employees had called the male delivery driver on duty to return to the store.

{¶10} When back up officers arrived, Officer Thompson walked behind the store to see if he could locate the delivery vehicle described; but did not see the vehicle. Officer

Thompson later found that the male delivery driver, Chafin, had returned and contacted him in the rear Jimmy John's parking lot. Upon Officer Thompson's initial contact, Chafin was found sitting in a black Jeep not fitting the description of the delivery vehicle and not wearing any clothing identifying him as a Jimmy John's employee.

{¶11} Officer Thompson later located Chafin's red Honda Civic parked in the back lot of a Burger King restaurant in close proximity to the Jimmy John's restaurant. Thompson noted numerous things about the interior of the red Civic that matched the description of the vehicle given by L.L. such as a distinctive sticker and a baby seat. Although Officer Thompson did not initially know of any familial connections at the Jimmy John's, he was able to later determine that Chafin's mother and sister were also employed at Jimmy John's and had spoken with Chafin as he sat in the black Jeep behind Jimmy John's. Officer Thompson would later arrange to have the red Honda Civic towed and was surprised to find that the red Honda had been moved from behind the nearby Burger King to the back lot of Jimmy John's. Chafin's mother, Lori Wood had possession of the car keys. Police had not requested that anyone move the vehicle. The red Honda was impounded with all contents left inside. Officer Thompson additionally canvassed nearby locations of other potential witnesses and obtained the morning delivery receipts made from Jimmy John's.

{¶12} After the police identified Chafin as the delivery driver, he remained with Officer Andrew Bennett, the second officer responding to the scene. Officer Bennett learned from Jimmy John's staff that Chafin was sitting in the parking lot behind the restaurant. Officer Bennett was wearing an AXON body camera that captured much of

his conversation and interaction with Chafin.  (1T. 296).  Officer Bennett's interactions with Chafin were played during trial and made part of the record as State's Exhibit 11.

{¶13}  During the video clip, Chafin can be observed sitting in a black Jeep and is wearing nothing identifying him as a Jimmy John's delivery driver.  Chafin, who appears upset and agitated, states several times that he had not picked up anyone in his delivery car that day.  Specifically, Chafin makes statements on the video such as: "I don't know this person"; "I've never met this person."; 'Nothing happened."; "I will be countersuing."; "It's one word against another.  I've prosecuted several cases myself"; "There is no evidence." and, "There's no way to prove it.  It's one against another."

{¶14}  At around eight minutes into the video clip, Chafin's mother, Lori Wood approaches Chafin and Officer Bennett.  Wood inquires of Officer Bennett if the witness (L.L.) has identified Chafin or his car.  Officer Bennett responds he does not have that level of information, to which, Chafin responds, "Nothing happened."

{¶15}  Chafin never suggests that LL. was ever inside his vehicle.  The closest Chafin came to acknowledging he gave anyone a ride on June 10, 2018 is in the form of a hypothetical he poses to Officer Bennett.  Chafin asks, "Hypothetically, say I did give her a ride it's still one person's word against another.  There is no proof of anything that happened so it's just going to get laughed the (expletive) out of court."

{¶16}  Detective Bryan Underwood was the assigned follow-up detective for the Chafin investigation.  At the time for trial, he had been promoted to a sergeant's position. (2T. 314).  In addition to directing other investigative activities, Underwood checked businesses near the subdivision for surveillance video.  Underwood had been on the scene at the Jimmy John's restaurant on June 10, 2018 and had observed Chafin's Jimmy

John's work clothing inside the red Civic. (2T. 322) (Exhibits 2A - 21). Detective Underwood noted in his brief conversation with Chafin at the Jimmy John's location on June 10, 2018, Chafin asserted nothing had occurred. (2T. 324-325). Chafin later made an utterance that he did not believe it to be against the law to give someone a ride. Detective Underwood had Chafin photographed in the clothing he was found to be wearing upon his initial officer contact. (2T. 328-329). Detective Underwood also met with L.L. at the Lancaster Police station and photographed injuries on her hands. Several days later L.L. would accompany Detective Underwood and the two would re-trace the route L.L. asserted Chafin had taken inside the subdivision. (2T. 334,335). L.L. was able to locate the point in the subdivision where she jumped from the car near two large rocks. (2T. 345).

{¶17} Detective Underwood estimated the point where L.L. had left the vehicle to be approximately 100 feet past the last stop sign. (2T. 347). Detective Underwood further noted that no exits existed at the back (North) side of the neighborhood, which was the direction that Chafin was traveling when L.L. jumped out. (2T. 353,354). However, the following exchange occurred during the bench trial,

THE COURT: Okay. And then another follow-up question.

Can you exit onto Columbus Street by turning left there on Winterbrook, as the Defendant has claimed to have done?

SERGEANT UNDERWOOD: You can; however, you must go -- you must travel northbound onto Winterbrook Street clear to the very back of the complex and then make a right. And, Your Honor, I do not have a roadway name for you. But then that would continue on around to bring you

back around.  There's a large circle.  I think it's Green Meadows.  That's the large kind of circle that if you go around it, it'll weave back out.

> THE COURT: Okay.

2T. at 347-348.

{¶18}  At the conclusion of the evidence, the trial court convicted Chafin of the lesser-included offense of Attempted Abduction in violation of R.C. 2923.02(A), a felony of the fourth degree.  The court found the evidence supported that Chafin had taken a substantial step in committing the offense of Abduction.

{¶19}  On April 1, 2019, Chafin was sentenced to five-year term of community control sanctions with a local sanction of 60 days to be served in the county jail.  The trial court reserved an 18-month prison term in the event Chafin committed a violation sufficient for the trial court to impose a prison term.

*Assignment of Error*

{¶20}  Chafin raises one Assignment of Error,

{¶21}  "I.  THE CONVICTION OF THE DEFENDANT-APPELLANT WAS OBTAINED WITHOUT SUFFICIENT EVIDENCE BEING PRESENTED TO ESTABLISH EACH AND EVERY ELEMENT OF THE OFFENSE IN QUESTION."

*Law and Analysis*

{¶22}  In his sole assignment of error, Chafin argues there is simply no evidence that Chafin, at any time, exerted any force over L.L. or in any way threatened her in order to restrain her liberty.  [Appellant's Brief at 6].

**STANDARD OF APPELLATE REVIEW.**

*Sufficiency of the Evidence.*

{¶23} The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. __, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013); *Hurst v. Florida*, 136 S.Ct. 616, 621, 193 L.Ed.2d 504 (2016). The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court. *State v. Walker,* 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶30. "This naturally entails a review of the elements of the charged offense and a review of the state's evidence." *State v. Richardson,* 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶13.

{¶24} When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus: *Walker,* at ¶30. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. *State v. Poutney,* 153 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001), *quoting Jenks* at paragraph two of the syllabus (emphasis added); *Walker* at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could

not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997); *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶74.

**ISSUE FOR APPEAL**

{¶25} *A. Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, if believed, would convince the average mind of Chafin's guilt on each element of the crime of Attempted Abduction beyond a reasonable doubt.*

{¶26} Chafin was conviction of attempted abduction. R.C. 2905.02, Abduction, states,

(A) No person, without privilege to do so, shall knowingly do any of the following:

(1) By force or threat, remove another from the place where the other person is found;

(2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear;

(3) Hold another in a condition of involuntary servitude.

(B) No person, with a sexual motivation, shall violate division (A) of this section.

{¶27} R.C. 2093.02 defines "Attempt" as follows,

(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall

engage in conduct that, if successful, would constitute or result in the offense.

(B) It is no defense to a charge under this section that, in retrospect, commission of the offense that was the object of the attempt was either factually or legally impossible under the attendant circumstances, if that offense could have been committed had the attendant circumstances been as the actor believed them to be.

(C) No person who is convicted of committing a specific offense, of complicity in the commission of an offense, or of conspiracy to commit an offense shall be convicted of an attempt to commit the same offense in violation of this section.

(D) It is an affirmative defense to a charge under this section that the actor abandoned the actor's effort to commit the offense or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of the actor's criminal purpose.

{¶28} The Ohio Supreme Court has held that a criminal attempt occurs when the offender commits an act constituting a substantial step towards the commission of an offense. *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059(1976), paragraph one of the syllabus, *overruled in part by State v. Downs (1977), 51 Ohio St.2d 47, 364 N.E.2d 1140; See also, State v. Ashbrook*, 5th Dist. No.2004-CA-00109, 2005-Ohio-740, *reversed on other grounds and remanded for re-sentencing pursuant to State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856; In re: Ohio Criminal Sentencing Statutes Cases, 109 Ohio St.3d 313, 2006-Ohio-2109.* In defining substantial step, the *Woods'* Court indicated

that the act need not be the last proximate act prior to the commission of the offense. *Woods* at 131-32, 357 N.E.2d 1059. However, the act "must be strongly corroborative of the actor's criminal purpose." Id. at paragraph one of the syllabus. This test "properly directs attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention, based upon observation of such incriminating conduct, in order to prevent the crime when the criminal intent becomes apparent." *Woods* at 132, 357 N.E.2d at 1063. In other words, a substantive crime would have been committed had it not been interrupted.

{¶29} R.C. 2923.02(D) provides that: "[i]t is an affirmative defense to a charge under this section that the actor abandoned his effort to commit the offense or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose." However, the abandonment must be "complete" and "voluntary" in order to exculpate a defendant. Where one abandons an attempted crime because he fears detection or realizes that he cannot complete the crime, the "abandonment" is neither "complete" nor "voluntary." *Woods*, at 48 Ohio St. 2d at 133.

{¶30} Precisely what conduct will be held to be a substantial step must be determined by evaluating the facts and circumstances of each particular case. *State v. Group*, 98 Ohio St.3d 248, 262, 2002-Ohio-7247 at ¶100, 781 N.E.2d 980, 996.

{¶31} The intent with which an act is committed may be inferred from the act itself and the surrounding circumstances, including acts and statements of a defendant. *State v. Garner*, 74 Ohio St.3d 49, 60, 1995-Ohio-168, 656 N.E.2d 623, 634; *State v. Wallen*, 21 Ohio App.2d 27, 34, 254 N.E.2d 716, 72 (5th. Dist. 1969).

{¶32}   If there is any substantial evidence to support the decision of the trial court, we must affirm such decision.  *In re Tilton*, 161 Ohio St. 571, 577, 120 N.E.2d 445 (1954). We are not permitted to substitute our judgment for that of the trial court, even if we were disposed to do so.  *Trickey v. Trickey*, 158 Ohio St. 9, 14, 106 N.E.2d 772 (1952).

{¶33}  In finding Chafin had commit a substantial step toward the commission of the crime of abducting, the trial court noted as follows,

So you've got these comments.   The Defendant has this impressionable 15-year old.  Holly smokes, when you look at the personality of the 15-year old, she is extremely backward, extremely backward, extremely impressionable, and extremely vulnerable.   She is socially awkward. And for a person to make advances on someone like that makes him even more so of a predator type.

The other thing that the Court sees is that the Defendant could have easily left Two Ridge after his delivery and made a right-hand turn. As I look at State's Exhibit 15, he could have turned east on Two Ridge. And instead of going north at the very next turn, he could have gone south, which would have taken him into a central loop for direct exit onto North Columbus Street. And as a pizza delivery person that's been engaged -- or subs, delivery of subs for the last four months, he should have strong knowledge of this particular area. Instead, he turned left instead of right, and this took him even further away from taking this victim back to where she wanted to go.

* * *

This Court is going to find an attempt to commit abduction under the circumstances. The Court believes that there was a substantial act in furtherance of an abduction.

The substantiality of the act is confirmed by the Defendant -- sorry -- the complaining witness' young age, her vulnerability, the Defendant's advances, verbal advances upon the 15-year old, the fact that he was moving in a direction going against her desired direction.

The complaining witness had given him the privilege only to deliver this one take-out order, delivery order, and the Defendant, by going in the wrong direction and by making an advance, both verbally and even physically by attempting to touch the complaining witness' hand, that this was an attempt to abduct.

So the Court is finding that the Defendant, in Fairfield County, on or about June 10th, 2018, going beyond the privilege that was afforded him, did attempt, by force or threat -- mostly by force -- to restrain the liberty of [L.L.], under circumstances that did create a risk of physical harm to her. She felt that she needed to jump out of a moving vehicle. He injured her left hand. And this also caused her to be in fear that something bad was coming around the corner. She was leaving the vehicle in order to minimize the potentialities of evil that might be forthcoming.

2T. at 426-429.

{¶34} In a case involving the element of "force" with respect to the crime of robbery, this Court has observed,

The use of force element is satisfied "if the fear of the alleged victim was of such a nature as in reason and common experience is likely to induce a person to part with property against his will and temporarily suspend his power to exercise his will by virtue of the influence of the terror impressed." *State v. Davis* (1983), 6 Ohio St.3d 91, 451 N.E.2d 772. The test for force is objective and relies on the totality of the circumstances. *State v. Habtemariam* (1995), 103 Ohio App.3d 425, 659 N.E.2d 850. A victim's fear of harm must be objectively reasonable under the circumstances. *State v. Bush* (1997), 119 Ohio App.3d 146, 694 N.E.2d 984

{¶35}  After review of the record in this case as set forth above, and viewing the totality of the circumstances, we find that the evidence supports a finding under the objective test that L.L.'s fear of harm was objectively reasonable.

{¶36}  Viewing the evidence in the case at bar in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Chafin had committed the crime of Attempted Abduction.

{¶37}  We hold, therefore, that the state met its burden of production regarding each element of the crime of Attempted Abduction and, accordingly, there was sufficient evidence to support Chafin's conviction.

{¶38}  Chafin's sole assignment of error is overruled.

{¶39}   The judgment of the Fairfield Court of Common Pleas is affirmed.


By Gwin, P.J.,

Hoffman, J., and

Delaney, J., concur