[Cite as *State v. Rudasill*, 2021-Ohio-45.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 19AP-61 |
| | | (C.P.C. No. 18CR-389) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Demarius M. Rudasill, | : | |
| Defendant-Appellant. | : | |

───────────────

D E C I S I O N

Rendered on January 12, 2021

───────────────

**On brief**: [*G. Gary Tyack*], Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief**: *Campbell Law LLC*, and *April F. Campbell*, for appellant.

───────────────

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Demarius M. Rudasill, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which appellant was found guilty of murder, aggravated robbery, and having weapons while under disability.

{¶ 2} On January 25, 2018, appellant was indicted on one count of aggravated robbery, in violation of R.C. 2911.01, one count of aggravated murder, in violation of R.C. 2903.01, one count of murder, in violation of R.C. 2903.02, and one count of having weapons while under disability, in violation of R.C. 2923.13. Each of the first three counts

also carried firearm specifications. The indictment arose out of the shooting death of a teenager, R.D., on August 18, 2017.

{¶ 3} The matter came for trial before a jury beginning January 7, 2019. In August 2017, Anthony Norvett and his girlfriend, Elizabeth Cordery, resided near East 15th Avenue, Columbus. On the evening of August 18, 2017, Norvett heard the sound of a gunshot nearby. Cordery, who was working third shift that evening, arrived home the next morning at approximately 8:00 a.m. and observed someone lying on the steps of a nearby residence. A short time later, Cordery walked over to the area with her sister and "found [the victim] dead, blood on the porch." (Tr. Vol. II at 193.) Cordery dialed 911, and Cordery's sister took video of the scene.

{¶ 4} On August 19, 2017, at 8:20 a.m., Columbus Police Officer Vincent A. Miller responded to the scene at East 15th Avenue. Upon arrival, he observed a male on a porch step "bleeding from the mouth." (Tr. Vol. II at 203.) The officer "got no reaction at all from him, so I thought he was probably deceased at that point." (Tr. Vol. II at 204.) At trial, Officer Miller identified photographs taken of the crime scene, as well as photographs of the deceased victim.

{¶ 5} R.V., age 17, testified he was currently in a juvenile placement program. R.V. was a friend of the shooting victim, R.D. On August 18, 2017, R.V. had spent the night at a "female's house in the Short North." (Tr. Vol. II at 227.) That morning, he "woke up to somebody knocking on the door. [He] answered the door and it was Nutto, [R.D.] and another person whose name [he] forg[o]t." R.V. had known "Nutto" (later identified as Nasear Smith) for several years "[f]rom the neighborhood and * * * through other people." (Tr. Vol. II at 228.)

{¶ 6} R.V. testified that R.D. "came in with his gun that I didn't know he had, and Nutto had a gun on him." R.V. stated that "they had an extra gun," and "we all asked him where he had got the gun from." (Tr. Vol. II at 228.) Nutto "told me that they had robbed somebody's house for it and Nutto just provided the ride, but [R.D.] had actually went in to go get the gun." (Tr. Vol. II at 230.) R.D. and Nutto began "arguing over whose gun it was." (Tr. Vol. II at 231.)

{¶ 7} A short time later, Nutto went upstairs to take a shower. R.V. testified that, while Nutto was in the shower, R.D. "sold the gun to my other friend named Fatz" for

approximately $200. (Tr. Vol. II at 231.) When Nutto came back downstairs, Fatz informed Nutto that R.D. " 'just sold it to me.' " Nutto and R.D. then "started arguing about it." Nutto "said, 'Why you selling my gun?' And [R.D.] told him that it was his gun because he was the person who actually went inside the house that they robbed to get it and Nutto had just provided the ride." (Tr. Vol. II at 232.)

{¶ 8} R.D. then offered to " 'shoot dice for it.' " (Tr. Vol. II at 233.) R.D. won the dice game and "was acting cocky." R.D. "told [Nutto] like, 'You should have never * * * put your money up. This is mine now. I just scoped * * * you.' " R.V. testified that if R.D. wins a bet, he usually gives the other person "half their money back, but he didn't do that this time." (Tr. Vol. II at 234.) Instead, R.D. gave half of the money he won to R.V.

{¶ 9} R.D. then asked R.V. to go to a cookout with him. They asked Nutto for a ride, and Nutto "told us he needed $20 first." (Tr. Vol. II at 235.) Fatz offered to give them a ride for $10, and "then Nutto was like, never mind, I'll take you all for $10. So we * * * just rode with Nutto because [R.D.] felt bad he took his money already, so he wanted him to have a chance to get some money that he lost back." (Tr. Vol. II at 235-36.)

{¶ 10} Nutto gave R.D. and R.V. a ride to the home of R.D.'s grandmother. A short time later, R.D. and R.V. walked down the street to the cookout. After leaving the cookout, R.D. and R.V. decided to "get a hotel," but they needed a ride. (Tr. Vol. II at 237.) R.D. told R.V. "he was going to call Nutto to drop us off." R.V. responded that he did not " 'think that would be a good idea' " to call Nutto since R.D. had just taken " 'money out of his [Nutto's] pocket in the dice game' " and had " 'just sold his gun.' " (Tr. Vol. II at 238.)

{¶ 11} R.D. called Nutto, and Nutto pulled up quickly. Nutto drove to a gas station on Cleveland Avenue and, "out of nowhere," appellant, who R.V. referred to as "Rudy," and another individual referred to as "Man-Man," walked up to the car. Appellant and Man-Man got inside the vehicle. R.V. was seated in the middle back seat, with Man-Man "on the left side of me and [appellant] * * * on the right side of me behind [R.D.]." R.V. did not know Man-Man and appellant, but R.D. "knew them" and he "introduced me to them." (Tr. Vol. II at 240.)

{¶ 12} After everyone got into the car, "Nutto told us he had to make a stop." They "stopped at Nutto's people's house." (Tr. Vol. II at 241.) Upon arriving, everyone exited the vehicle; Nutto, Man-Man, and appellant walked inside the residence, but R.V. and R.D.

were left outside because "they had shut the door on us * * * and Nutto told us that he wanted us to wait in the car because his people didn't know us, so we said okay and we sat in the car and waited on them." (Tr. Vol. II at 242.)

{¶ 13} After approximately 20-30 minutes, the other individuals returned to the car. Once inside the vehicle, "Man-Man told us that he had this * * * he referred to it as a lick, somebody for us to rob for a check for some money. * * * He said somebody had got some money * * * like, a first of the month check or something like that." (Tr. Vol. II at 242.) R.V. testified he was not in agreement with the plan, and that he "was ready to go to the hotel. I had told [R.D.] * * * I already had text[ed] the girls to tell them to just meet us at the hotel * * * and they wanted to go rob somebody." (Tr. Vol. II at 245.)

{¶ 14} The others discussed robbing the individual with the check, and R.V. testified that he had a "feeling" they were "going to make [R.D.] do it" because R.D. "had a gun on him." However, before they "even got to the house that we was supposed to rob, Nutto had asked did we want to go shoot up a dude named Rail's house." R.D. "had problems with a person named Rail, so they all agreed to do it." (Tr. Vol. II at 246.) R.V. agreed to participate also.

{¶ 15} They arrived in an alley behind this individual's house, and Nutto "told [R.D.] to start shooting and [R.D.] had put his gun out the window like he was about to shoot." R.V., however, who was seated behind R.D., "snatched [R.D.'s] gun out of his hand" because R.V. "didn't see Rail" and "there were kids in the backyard." (Tr. Vol. II at 247.)

{¶ 16} The other individuals in the vehicle were mad at R.V., "cussing [him] out." Nutto sped away from the area and drove to the house "we was supposed to rob." When they arrived, it was "nighttime." (Tr. Vol. II at 248.)

{¶ 17} Nutto, who remained in the vehicle, "gave his gun to [appellant] when [appellant] got out of the car and Man-Man didn't have a gun on him." R.D. "had his gun." (Tr. Vol. II at 249.) R.V. described the weapon Nutto handed to appellant as "a Glock." (Tr. Vol. II at 250.) R.D. exited the vehicle; R.V. also began to exit the vehicle, but R.D. "put his hand on my chest and just pushed me back on the seat * * * lightly." R.D. said to R.V.: " 'You don't even got no gun. They already mad because you didn't let me shoot up Rail's house, so you might as well just stay in here with Nutto and I'll be right back.' And he told

me he loved me and I told him, all right, I love him too.' "  At that point, appellant, Man-Man and R.D. "got out of the car." (Tr. Vol. II at 249.)

{¶ 18} Nutto sat in the vehicle with some earphones on, while R.V. sat occupied with his phone.  A short time later, R.D. "came back running to the car and Man-Man followed up after him running back to the car."  Nutto "asked him what was wrong," and R.D. said "I ain't feeling it, the neighbor is outside on the front porch."  R.V. told R.D. he "might as well get back in the car."  Man-Man, however, "insisted that he go back."  R.D. then "said, 'All right, I'm going to try again.' "  (Tr. Vol. II at 251.)  R.D. and Man-Man then returned to the house.

{¶ 19} A short time later, R.V. "heard a loud sound."  R.V. "snatched the earphones out of Nutto and * * * said, 'You hear that?' "  Nutto responded: " 'Yeah, that's probably them just kicking in the backdoor.' "  (Tr. Vol. II at 252.)

{¶ 20} Man-Man then "came running back to the car and * * * as soon as he had got in the car, Nutto just took off driving and was going real fast." (Tr. Vol. II at 252-53.)  Nutto asked " 'Where's my gun,' and then Man-Man gave him the gun." (Tr. Vol. II at 253.)  R.V. testified it was the same weapon Nutto had earlier handed to appellant as appellant was exiting the vehicle.

{¶ 21} Man-Man "was crying," and R.V. "asked him what happened."  (Tr. Vol. II at 253.)  R.V. then asked Man-Man: " 'Where [R.D.] at?'  I'm like, 'Where the other dude, Rudy, at?' And he was like, 'Well, I don't know, I don't know, brother, the neighbors just came back there shooting.' "  (Tr. Vol. II at 253-54.)  R.V. told Nutto to turn the car around, but Nutto indicated the car was " 'a hottie,' " meaning "it's a stolen car."  They eventually let R.V. out "in the middle of the street," and he "ran back towards the area where everything happened."  (Tr. Vol. II at 254.)

{¶ 22} As R.V. approached the area, he was "yelling [R.D.'s] name * * * hoping that he could hear me."  When he arrived "on the street * * * where it happened at, I had seen a figure in the shadow with some shoes * * * that had reflectors on it and * * * I feel like it was the same type shoes that [appellant] was wearing.  So I didn't go back into the backyard." (Tr. Vol. II at 254.)

{¶ 23}  R.V. then ran to a friend's house and told his friend "I think [R.D.] had got shot." (Tr. Vol. II at 255.)  The friend said he could not go with him because he was watching

his niece. The next morning, R.V. called his friend "Fatz," and they drove to the location, but the area was "taped off." (Tr. Vol. II at 256.) R.V. spoke with law enforcement officers approximately ten days after the incident. At trial, R.V. identified appellant as the same individual, "Rudy," who he was with on the date of the incident. (Tr. Vol. II at 259.)

{¶ 24} Columbus Police Detective Daniel G. Douglas, a member of the crime scene search unit, responded to the scene at East 15th Avenue. At trial, Detective Douglas identified photographs taken of the crime scene and the victim, including coroner photographs. The detective identified a shell casing found at the scene.

{¶ 25} Dr. John A. Daniels, a deputy coroner and forensic pathologist with the Franklin County Coroner's Office, identified plaintiff-appellee, State of Ohio's, Exhibit C as the coroner's findings for R.D. Dr. Daniels testified the victim suffered "a gunshot wound that entered the left side of the neck and exited near the right eye." The wound "entered towards the back of the neck." (Tr. Vol. II at 348.) Dr. Daniels estimated the wound was inflicted from a distance of "very close to about two feet." (Tr. Vol. II at 357.) He opined the manner of death was "homicide" caused by a "gunshot wound of the head and neck." (Tr. Vol. II at 360-61.)

{¶ 26} On September 15, 2017, Columbus Police Officer Emanuel Woods interviewed appellant at Columbus Police headquarters. A homicide detective, Ronda Siniff, had asked Officer Woods to participate in the interview with appellant because the officer had "somewhat of a * * * rapport with him." (Tr. Vol. III at 389.) The detective told Officer Woods that "she had information that [appellant] was involved in a homicide. She told me that -- I guess he wasn't the shooter, but they had witnesses that placed him there." (Tr. Vol. III at 396.)

{¶ 27} During the interview, appellant told the officer that "initially it was supposed to have been a robbery and pretty much it went a different way." Appellant stated they were "only supposed to rob [R.D.], * * * and that Man-Man was the shooter." The incident arose "over a gun." Appellant "said that he did not have a gun and pretty much wanted a gun." (Tr. Vol. III at 400.) Appellant told the officer that R.D. and Nutto had earlier been involved in "a robbery and got a gun * * * and ended up selling the gun. The gun was supposed to go to [appellant] and they ended up selling it, so * * * Nutto called [appellant] and told him that he'd just rob [R.D.] for his gun to get [R.D.'s] gun." (Tr. Vol. III at 400-01.)

{¶ 28} Appellant stated "they were somewhere near Weber [Road] and he was picked up by Man-Man and [R.D.] and Nutto and R.V. and they all left and went to * * * some street and * * * the plan was to rob [R.D.] for the gun so that he can get a gun." (Tr. Vol. III at 401.) Appellant stated they told R.D. "that some old man was staying around the corner who had some money and they was going to kick in the door and * * * rob the old man." Appellant told the officer it was "a made-up story, that there wasn't anybody to rob. The whole plan was to rob [R.D.]." (Tr. Vol. III at 403.)

{¶ 29} They parked the car near a vacant house. Appellant related "that when they got out of the car [R.D.] was * * * towards the front walking," and "Man-Man was directly behind him * * * to the left of him." As they walked behind the house, appellant's "initial thing was to * * * look to make sure nobody was coming and he said at that time he seen Man-Man up the gun, which means raise the gun." (Tr. Vol. III at 404.) Appellant "said something like, '[h]old on.' " (Tr. Vol. III at 405.) Appellant told Man-Man to hold on "to * * * look and make sure nobody was coming." (Tr. Vol. III at 406.) After appellant "had told him, '[h]old on, * * * that's when [appellant] said [Man-Man] just pulled the trigger," and appellant "heard the pop and saw him fall." Appellant informed the officer the victim was shot "[i]n the back of the head." (Tr. Vol. III at 405.)

{¶ 30} Appellant told the officer that, after he saw R.D. fall to the ground, he "took off running between the houses." Appellant stated that, as he was running, "there was a house to the left of him where some old guy was * * * and the guy started shooting at him." Appellant "continued running between the houses away from where it happened." When asked why he did not go back to the car with Man-Man, appellant "said his thing was just to get the gun and leave and go call his brother to come and get him." (Tr. Vol. III at 406.)

{¶ 31} At the close of the state's case-in-chief, defense counsel made a Crim.R. 29 motion for judgment of acquittal, which the trial court denied. Following deliberations, the jury returned verdicts finding appellant guilty of murder, aggravated robbery, and having a weapon while under disability. By judgment entry filed January 16, 2019, the trial court sentenced appellant to a total term of 22 years to life. On January 23, 2019, the trial court filed an amended judgment entry.

{¶ 32} On appeal, appellant sets forth the following four assignments of error for this court's review:

[I.] Rudasill's trial attorney was ineffective with resulting prejudice because he did not move to suppress his statements, because substantive inadmissible hearsay was introduced without objection, and because he failed to request a jury instruction on abandonment.

[II.] The State's evidence against Rudasill was legally insufficient as a matter of law.

[III.] The evidence weighed manifestly against convicting Rudasill of murder and aggravated robbery.

[IV.] The trial court committed reversible error in failing to provide a jury instruction on the affirmative defense to Rudasill's complicity acts.

{¶ 33} Under the first assignment of error, appellant raises claims of ineffective assistance of counsel in which he asserts his trial counsel was deficient in failing to: (1) move to suppress appellant's statements, (2) object to substantive inadmissible hearsay during the trial, and (3) request an instruction on abandonment.

{¶ 34} In order to prevail on a claim of ineffective assistance of counsel, a defendant must "show, first, that counsel's performance was deficient and second, that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶ 391, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Further, "[t]he failure to make either showing defeats a claim of ineffective assistance of counsel." *State v. Kennard,* 10th Dist. No. 15AP-766, 2016-Ohio-2811, ¶ 14, citing *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989). In order to "demonstrate that counsel's performance was deficient, appellant must show that his counsel committed errors which were ' "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." ' " *Id.* at ¶ 15, quoting *State v. Phillips*, 74 Ohio St.3d 72, 101 (1995), quoting *Strickland* at 687.

{¶ 35} Appellant first contends his trial counsel was ineffective in failing to move to suppress statements he made to law enforcement officials during the interview at police headquarters. In support, appellant cites comments made by defense counsel to the jury during opening statements in which counsel argued appellant was young and inexperienced, that he could not read or write, and police "pretty much had their way as far

as questioning my client." (Tr. Vol. II at 173.) Appellant contends that trial counsel was, in essence, arguing he did not knowingly and voluntarily waive his *Miranda* rights.

{¶ 36} Because the decision whether to file a motion to suppress " 'falls within matters of trial strategy, counsel is not required to file a motion to suppress evidence in every case.' " *State v. Riffle*, 8th Dist. No. 107352, 2019-Ohio-3271, ¶ 9, quoting *State v. Price*, 8th Dist. No. 90308, 2008-Ohio-3454, ¶ 19, citing *State v. Flors*, 38 Ohio App.3d 133 (8th Dist.1987), paragraph two of the syllabus. Thus, "[t]rial counsel is not per se ineffective when it fails to file a motion to suppress." *Id.,* citing *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000). Rather, a trial counsel's "failure to file a motion to suppress constitutes ineffective assistance only when the defendant can show that the motion 'would have "had a reasonable probability of success" and affected the outcome of the case.' " *Id.*, quoting *State v. Patterson*, 8th Dist. No. 105265, 2017-Ohio-8318, ¶ 35, quoting *State v. Sanchez*, 8th Dist. No. 103078, 2016-Ohio-3167, ¶ 22.

{¶ 37} It is well-settled that "[a] suspect in police custody ' "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." ' " *State v. Valentine*, 10th Dist. No. 14AP-893, 2016-Ohio-277, ¶ 10, quoting *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, ¶ 6-7, quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A suspect may, however, "waive or relinquish a known right" and, "[i]n the context of *Miranda*, the United States Supreme Court has explained the two aspects of waiver." *Id.* First, "relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "[s]econd, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

{¶ 38} Under Ohio law, "[a] court may infer from the totality of the circumstances that a defendant voluntarily, knowingly, and intelligently waived his rights." *Id.* at ¶ 11, citing *State v. Clark*, 38 Ohio St.3d 252, 261 (1988); *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 52. A review of the totality of the circumstances "includes 'the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency

of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *Id.*, quoting *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, ¶ 25, quoting *State v. Eley*, 77 Ohio St.3d 174, 178 (1996). Further, " '[o]nly if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' " *Id.*, quoting *Lather* at ¶ 7, quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

{¶ 39} In the instant case, appellant points to nothing specific in the record indicating he did not understand his *Miranda* rights so as to render his statements involuntary. As noted under the facts, Columbus Police Officer Woods conducted an interview of appellant at police headquarters on September 15, 2017, at the request of Detective Siniff. At trial, Officer Woods identified state's Exhibit K as a waiver of rights form signed by appellant. Officer Woods testified that Detective Siniff reviewed the waiver of rights form with appellant; Officer Woods was standing in the hallway at the time and heard the detective read the form to appellant. The interview took place at approximately 4:38 p.m.

{¶ 40} At the time of the interview, Officer Woods was not familiar with the case, and Detective Siniff gave him very few details. The detective told Officer Woods that witnesses had placed appellant at the scene of a shooting. Officer Woods testified the "[s]trategy was just to go in and just look him in the eye, man to man, and * * * if you have anything * * * to tell us, let us know. * * * I'm not in here screaming at you * * * but * * * if you have some information * * * let us know." (Tr. Vol. III at 397.) The officer stated the interview was recorded on both video and audio.

{¶ 41} Officer Woods testified that he initially told appellant "they had some information on him that put him * * * at a homicide scene." (Tr. Vol. III at 398.) At first, appellant denied any involvement. Officer Woods stated that "we continued to be calm with him, just * * * hey, man, * * * just tell us what happened." Appellant then "put his hands on his face, his eyes started turning like really red; so that's when I just waited to see would he say something and that's when he started telling me about it." (Tr. Vol. III at 399.) At one point during the interview, appellant took a piece of paper and drew a diagram, indicating "where they parked at the house and the alleys." (Tr. Vol. III at 411.)

{¶ 42} While appellant cites his age and inexperience, there is no indication from the record that those factors prevented him from acting voluntarily. Under Ohio law, "an individual's low intellect does not necessarily render him or her incapable of waiving *Miranda* rights." *State v. Lynn*, 7th Dist. No. 11 BE 18, 2011-Ohio-6404, ¶ 14, citing *State v. Jenkins*, 15 Ohio St.3d 164, 233 (1984); *State v. Hall*, 48 Ohio St.2d 325, 333 (1976). Rather, an individual's "low intellect is but one of many factors under the totality of circumstances that a court must consider in assessing the voluntariness of a *Miranda* waiver or confession." *Id.*, citing *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 113. *See also Garner v. Mitchell,* 557 F.3d 257, 264 (6th Cir. 2009) ("mental capacity is one of many factors to be considered in the totality of the circumstances analysis regarding whether a *Miranda* waiver was knowing and intelligent," and therefore "diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights").

{¶ 43} The record indicates appellant was 21 years of age at the time of the events and had some prior experience with law enforcement. While appellant emphasizes he is unable to read and write, Officer Woods testified that Detective Siniff read and reviewed with appellant his *Miranda* rights, and appellant signed the waiver of rights form. Further, there is nothing in the record to suggest he had difficulty understanding or answering the interview questions; Officer Woods testified that appellant did not appear confused during the interview, and he never told the officer he did not understand any of the questions. Appellant does not identify, nor does the record indicate, any coercive tactics by police officers conducting the interview. At no time did appellant request the presence of an attorney or family member. The record also does not suggest police pressured appellant into making the statements; as noted, at one point during the interview appellant willingly drew a diagram of the crime scene for the officers.

{¶ 44} Here, in the absence of evidence of police overreaching or any indication appellant was unable to understand the rights he was waiving, the record fails to support a claim the statements were involuntary or taken in violation of *Miranda*. Appellant has therefore failed to demonstrate a reasonable probability that a motion to suppress would have been successful. Accordingly, appellant's counsel was not ineffective in failing to file a motion to suppress.

{¶ 45} Appellant also contends his trial counsel was ineffective in failing to object to substantive hearsay during trial.  Specifically, appellant argues R.V. was permitted to speculate that appellant agreed to a plan to rob an individual of a paycheck, and that R.V. similarly speculated appellant agreed to participate in shooting up the house of an individual named Rail.  Appellant further argues counsel should have objected to R.V.'s statement that he had a feeling appellant was going to make the victim commit a robbery.

{¶ 46} To the extent appellant challenges R.V.'s testimony about statements made by appellant, we agree with the state that such statements were admissible as admissions by a party opponent under Evid.R. 801(D)(2).  Pursuant to Evid.R. 801(D)(2)(a), a statement is not hearsay if it is "offered against a party and is * * * the party's own statement."  Thus, any objection to admission of those statements would have not been successful.

{¶ 47} As noted, appellant also challenges R.V.'s statements regarding plans by those in the vehicle to rob an individual of a check and to shoot up an individual's house as inadmissible hearsay.  We disagree.  Pursuant to Evid.R. 801(C), hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

{¶ 48} In the present case, R.V. provided direct testimony regarding the events on the date of the incident, including his acquiescence in the decision to drive to the house of an individual named Rail and to shoot up the house, and he also testified as to his observations of the other individuals, including appellant.  Stated otherwise, R.V. provided testimony as an eyewitness to the events (i.e., based on his own personal observations and not out-of-court statements), he was subject to cross-examination on those matters, and such testimony did not constitute hearsay.  *See, e.g., State v. Perry,* 8th Dist. No. 65455 (May 12, 1994) ("[p]ersonal observations of a witness are not hearsay"); *State v. Havens,* 9th Dist. No. 20020 (Nov. 1, 2000) (testimony of deputy was not hearsay because he did not testify to any out-of-court statements but, rather, testimony "was based on his own personal observations"); *State v. Waver,* 12th Dist. No. CA2015-08-155, 2016-Ohio-5092, ¶ 51 (like any other witness, testimony by co-conspirator "regarding her direct observations and actions was admissible, regardless of her status as a co-conspirator" and, "[a]dditionally [the co-conspirator] could testify to any statement made directly to her by

appellant, as an admission by a party-opponent pursuant to Evid.R. 801(D)(2)(a)").  Here, counsel was not ineffective for "failing to object to admissible evidence."  *State v. McKinzie,* 10th Dist. No. 00AP-1182 (June 5, 2001).

{¶ 49}  Appellant also contends his trial counsel was ineffective for failing to request an instruction on abandonment, asserting that the only rational affirmative defense to felony murder was to argue he withdrew from the alleged plan to rob R.D.  Appellant maintains there was evidence of abandonment based on the testimony of Officer Woods as to statements made by appellant during the interview; specifically, appellant points to testimony by the officer indicating that appellant, at the time Man-Man raised the gun, told him to "[h]old on."  (Tr. Vol. III at 405.)  Appellant argues, therefore, his counsel should have objected to the court's failure to charge on the affirmative defense as outlined in R.C. 2923.03(E).

{¶ 50}  The affirmative defense of abandonment "is a possible defense to a conviction for complicity in the commission of an offense under R.C. 2923.03(E)."  *State v. Hawkins*, 8th Dist. No. 44747 (Dec. 16, 1982).  R.C. 2923.03(E) states: "It is an affirmative defense to a charge under this section that, prior to the commission of or attempt to commit the offense, the actor terminated his complicity, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

{¶ 51}  A review of the record indicates the defense's theory of the case, as reflected by counsel's comments during closing argument, was that appellant was aware of a plan to rob an unnamed individual of a check, but that he "didn't know that the actual victim of the robbery was going to be [R.D.]."  (Tr. Vol. III at 530.)  Defense counsel further argued appellant did not want to be involved in "any homicide."  (Tr. Vol. III at 533.)

{¶ 52}  As argued by the state, a denial of involvement is inconsistent with a claim of abandonment.  *See*, *e.g.*, *State v. Sheridan*, 3d Dist. No. 5-80-31 (June 25, 1981) (charge on abandonment neither justified nor required as defendant's denial he had any intent to commit rape or to attempt to commit rape was "totally inconsistent with a theory of abandonment of an attempted crime"); *State v. James*, 8th Dist. No. 72922 (Sept. 24, 1998) (defense counsel not ineffective in failing to raise affirmative defense of abandonment where thrust of appellant's defense at trial was that he did not participate in any way in the shootings of the victims whereas a defense of abandonment, by contrast, "implies initial

participation in a scheme but then renunciation of it"); *State v. Whitfield,* 2d Dist. No. 12297 (Jan. 17, 1992) (appellant's defense that he was totally without criminal culpability "would have been inconsistent with a defense of having completely and voluntarily renounced a prior criminal purpose"); *State v. Fickenworth,* 10th Dist. No. 13AP-826, 2014-Ohio-2502, ¶ 15 (trial court did not err in failing to instruct on abandonment where appellant "unequivocally" denied being involved in a conspiracy to commit murder).

{¶ 53} Further, in order to prove abandonment/termination, a defendant is required to show that he "manifested a complete and voluntary renunciation of his criminal purpose." *State v. Hernandez-Martinez*, 12th Dist. No. CA2011-04-068, 2012-Ohio-3754, ¶ 40. As noted, appellant argues that his statement to "hold on" evinced abandonment of any participation in the robbery of R.D. According to the testimony of Officer Woods, however, appellant's initial role was to "look to make sure nobody was coming." (Tr. Vol. III at 404.) Officer Woods further testified that when Man-Man raised the weapon, appellant told Man-Man to hold on "just to * * * look and make sure nobody was coming." (Tr. Vol. III at 406.)

{¶ 54} Under Ohio law, "[w]here one abandons an attempted crime because he fears detection or realizes that he cannot complete the crime, the 'abandonment' is neither 'complete' nor 'voluntary.' " *State v. Chafin*, 5th Dist. No. 2019 CA 00014, 2019-Ohio-5306, ¶ 29, quoting *State v. Woods,* 48 Ohio St.2d 127, 133 (1976), *overruled on other grounds*, 51 Ohio St.2d 47. *See also State v. Green*, 4th Dist. No. 92 CA 32 (Dec. 14, 1993) (noting "[m]any [Ohio] courts have agreed that the act of ending a crime due to the fear of detection is not a 'complete and voluntary renunciation' "). Further, "the mere act of telling someone not to do a crime does not manifest a 'complete and voluntary renunciation of [a] criminal purpose.' " *State v. Washington,* 6th Dist. No. L-90-199 (May 31, 1991), quoting R.C. 2923.03(E).

{¶ 55} Given the defense's theory of the case and the evidence presented, we find unpersuasive appellant's contention that defense counsel was ineffective in failing to request an instruction on abandonment under R.C. 2923.03(E). Based on the foregoing, appellant has failed to establish ineffective assistance of counsel under *Strickland*.

{¶ 56} Appellant's first assignment of error is not well-taken and is overruled.

{¶ 57} Appellant's second and third assignments of error are interrelated and will be considered together. Under these assignments of error, appellant challenges both the sufficiency and the weight of the evidence supporting his convictions.

{¶ 58} A motion for judgment of acquittal under Crim.R. 29(A) "tests the sufficiency of the evidence." *State v. Samuel,* 10th Dist. No. 11AP-158, 2011-Ohio-6821, ¶ 22, citing *State v. Reddy*, 10th Dist. No. 09AP-868, 2010-Ohio-3892, ¶ 12, citing *State v. Knipp*, 4th Dist. No. 06CA641, 2006-Ohio-4704, ¶ 11. Thus, an appellate court reviews the trial court's denial of appellant's motion for acquittal "using the same standard applicable to a sufficiency of the evidence review." *Id.,* citing *Reddy*, citing *State v. Darrington*, 10th Dist. No. 06AP-160, 2006-Ohio-5042, ¶ 15. In considering a sufficiency challenge, "the test is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 59} By contrast, in considering a challenge to the manifest weight of the evidence, a reviewing court "may not merely substitute its view for that of the trier of fact," but rather "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Boone,* 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶ 60} We first consider appellant's contention that the state's evidence was insufficient to convict him of complicity to commit aggravated robbery and murder. R.C. 2911.01(A) defines the offense of aggravated robbery, and states in part: "No person, in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense, shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either * * * brandish it * * * or use it; * * * (3) Inflict, or attempt to inflict, serious physical harm on another." R.C. 2903.02(B) defines

the offense of murder (i.e., felony murder) as follows: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree."

{¶ 61} R.C. 2923.03 sets forth Ohio's complicity statute. R.C. 2923.03(A) states in part: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * (2) Aid or abet another in committing the offense." The Supreme Court of Ohio has held that R.C. 2923.03 "does not define 'aid or abet,' but this court has stated that to aid or abet is ' "[t]o assist or facilitate the commission of a crime, or to promote its accomplishment." ' " *State v. McFarland*, __ Ohio St.3d __, 2020-Ohio-3343, ¶ 27, quoting *State v. Johnson*, 93 Ohio St.3d 240, 243 (2001), quoting *Black's Law Dictionary* 69 (7th Ed.Rev.1999).

{¶ 62} In order " '[t]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' " *Id.,* quoting *Johnson* at syllabus. Further, " ' "[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." ' " *Id.*, quoting *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist.1971).

{¶ 63} Appellant acknowledges the state proved his presence at the scene, but contends it failed to prove he supported, assisted, encouraged or cooperated with Man-Man in the offenses. According to appellant, he was unaware of Man-Man's intent to shoot the victim.

{¶ 64} With respect to the sufficiency of the evidence to support the conviction for aggravated robbery, the record indicates the state presented testimony by R.V. that appellant was with Man-Man and Nutto on the date of the incident. R.V. testified that, earlier that day, R.D. and Nutto had entered someone's house and stole a gun. Nutto and R.D. subsequently got into an argument about "whose gun it was." (Tr. Vol. II at 231.) Nutto then became upset when he learned R.D. had sold the gun to another individual.

{¶ 65} Later that evening, R.D. and R.V. attended a cookout, and R.D. then called Nutto to ask if he would drive them to a hotel. Nutto arrived in a vehicle and picked up R.D. and R.V. He then drove to a gas station and, "out of nowhere," appellant "and Man-Man

came up to the car." (Tr. Vol. II at 240.) Appellant and Man-Man got inside the vehicle with Nutto, R.V., and R.D. Nutto "told us he had to make a stop," and "[w]e * * * stopped at Nutto's people's house." (Tr. Vol. II at 241.) Upon arriving at a residence, Nutto, Man-Man, and appellant went inside, but R.D. and R.V. were told to remain outside in the car.

{¶ 66} Nutto, Man-Man, and appellant returned to the vehicle about "20 to 30 minutes" later. Nutto and Man-Man then discussed robbing someone who had just "got some money" from receiving a monthly check. (Tr. Vol. II at 242.) Before driving to that location, Nutto "asked did we want to go shoot up a dude named Rail's house." According to R.V., this individual (Rail) and R.D. had "beefed with" each other previously. (Tr. Vol. II at 246.) They arrived at an alley behind Rail's house, and R.D. had a weapon with him. R.D. reached the weapon outside the car window, but R.V. grabbed R.D.'s weapon and told him "we're not going to shoot up that house" because R.V. "didn't see Rail" and "there were kids in the backyard." (Tr. Vol. II at 247.)

{¶ 67} The others in the vehicle were mad at R.V., and Nutto sped away. Nutto then drove "to the house we [were] supposed to rob." (Tr. Vol. II at 248.) Upon arriving, Nutto remained in the car, but Nutto "gave his gun to [appellant]." R.D. also had a gun, but Man-Man did not have a weapon. R.V. tried to exit the vehicle, but R.D. told him to remain with Nutto because the others were " 'already mad because you didn't let me shoot up Rail's house.' " (Tr. Vol. II at 249.)

{¶ 68} Appellant, Man-Man, and R.D. then exited the vehicle and walked to the back of the residence. A few seconds later, R.D. came running back to the car with Man-Man following him. R.D. said "I ain't feeling it, the neighbor is outside on the front porch." Man-Man, however, talked R.D. into going back, and R.D. said he would "try again." (Tr. Vol. II at 251.) R.V. subsequently heard a loud noise, and Man-Man returned to the car and Nutto drove away quickly. Man-Man handed Nutto "the same gun" Nutto had earlier given to appellant. (Tr. Vol. II at 253.) R.V. demanded that Nutto stop the car and let him out. R.V. walked back toward the residence and observed a figure "in the shadow with some shoes" that R.V. thought resembled "the same type shoes that [appellant] was wearing," so he "didn't go back into the backyard." (Tr. Vol. II at 254.)

{¶ 69} The state also presented the testimony of Officer Woods who, at the request of a detective, interviewed appellant one month after the shooting. The detective requested

that the officer conduct the interview because he had a prior rapport with appellant. Officer Woods was not familiar with the case; the detective indicated "they had witnesses that placed [appellant]" at the scene of a homicide. (Tr. Vol. III at 396.)

{¶ 70} During the interview, appellant initially "denied it," stating "I don't know anything." (Tr. Vol. III at 398.) Appellant's eyes then "started turning * * * red," and "he started telling [Officer Woods] about it." (Tr. Vol. III at 399.) Appellant told the officer that "initially it was supposed to have been a robbery and pretty much it went a different way." Appellant stated they were "only supposed to rob R.D.," and "Man-Man was the shooter." The incident "happened over a gun." Appellant "said that he did not have a gun and pretty much wanted a gun." (Tr. Vol. III at 400.) Earlier on the date of the incident, R.D. and Nutto had stolen a gun from a residence, and "[t]he gun was supposed to go to [appellant] and they ended up selling it, so [appellant] told me that Nutto called him and told him that he'd just rob R.D. for his gun." (Tr. Vol. III at 400-01.)

{¶ 71} On the evening of the events, appellant was "somewhere near Weber [Road] and he was picked up by Man-Man and [R.D.] and Nutto and [R.V.] and they all left and went to * * * some street and pretty much the plan was to rob [R.D.] for the gun so that [appellant] can get a gun." (Tr. Vol. III at 401.) Appellant told the officer the others were "telling [R.D.] that some old man was staying around the corner who had some money and they was going to kick in the door and pretty much rob the old man. So that's * * * the story that was told to [R.D.] so he would go along." The house where the events occurred was vacant, "and the plan was that's where they [were] going to rob him at, where it was dark." Appellant told the officer the discussion of robbing an old man was "a made-up story, that there wasn't anybody to rob. The whole plan was to rob [R.D.]." (Tr. Vol. III at 403.) Appellant stated he was brought into the plan approximately "15 to 20 minutes" before the incident. (Tr. Vol. III at 408.)

{¶ 72} After appellant, Man-Man, and R.D. exited the vehicle and walked toward the back of the house, appellant's "initial thing was to * * * look to make sure nobody was coming and he said at that time he seen Man-Man * * * raise the gun." (Tr. Vol. III at 404.) Appellant told the officer "he said something like, '[h]old on,' * * * to make sure nobody is coming. So [appellant] had told [Man-Man], '[h]old on,' and that's when [Man-Man] just pulled the trigger and [appellant] heard the pop and saw [R.D.] fall." (Tr. Vol. III at 405.)

At first, appellant told the officer he did not see Man-Man fire the weapon, but he later "went back and changed his story and he said, yeah, I seen him shoot.  He said, I seen his body drop," and "he also said he [saw] the muzzle flash."  (Tr. Vol. III at 404.)  Appellant told the officer R.D. was shot in the "back of the head."  (Tr. Vol. III at 405.)  After the shot was fired, appellant "took off running between the houses."  (Tr. Vol. III at 406.)

{¶ 73} Construing the evidence most strongly in favor of the prosecution, as required in considering a sufficiency challenge, the record provides sufficient evidence to support appellant's conviction for complicity to commit aggravated robbery.  As set forth above, the state presented evidence that appellant was involved in a plot to rob R.D. of his weapon.  The state's theory of the case was that appellant, Nutto, and Man-Man planned the robbery approximately 20 to 30 minutes before the shooting incident when they went inside "Nutto's people's" house and told the juveniles, R.D. and R.V., to remain outside.  After returning to the car, these individuals begin talking about robbing an elderly man of a check.  During the police interview, appellant told Officer Woods that the discussion of robbing an old man was a made-up story to make R.D. go along.  Appellant admitted to Officer Woods that the plan was to rob R.D. of his weapon; specifically, appellant explained the intent of the robbery was "so that he can get a gun." (Tr. Vol. III at 401.)

{¶ 74} When they arrived at the location of the shooting, Nutto handed his weapon to appellant as appellant exited the vehicle.  When Man-Man returned to the vehicle after the shooting, he handed Nutto the same weapon Nutto had given to appellant moments earlier.  The victim died of a gunshot wound to the back of the head.  During the police interview, appellant drew a sketch of the scene where the events took place.  Based on the evidence presented, the jury could have reasonably concluded that appellant participated in a plan to commit a theft offense and that a deadly weapon was either brandished or used and/or that serious physical harm was recklessly inflicted on the victim during the theft offense.

{¶ 75} The evidence also supported appellant's conviction for complicity to commit felony murder.  As set forth above, the state presented evidence that appellant conspired with Nutto and Man-Man to rob R.D. so that appellant could obtain a weapon, ultimately leading to the death of R.D.  Appellant was aware that weapons were involved in the robbery.  As noted, R.V. testified that Nutto handed appellant his (Nutto's) weapon when

appellant exited the vehicle at the crime scene. According to the testimony of Officer Woods (who conducted the interview of appellant), appellant's role was to look out for anyone else in the area. Appellant admitted to the officer that he observed Man-Man fire the weapon to the back of the victim's head, and appellant did not flee the scene until after the shooting.

{¶ 76} While appellant contends he was unaware Man-Man was going to use the weapon in the robbery, "the state was not required to prove that." *State v. Kimble*, 7th Dist. No. 06 MA 190, 2008-Ohio-1539, ¶ 26. Rather, "[v]iolation of the complicity statute requires that the accomplice be treated 'as though he was the one who committed every act of the underlying principal offense.' " *Id.* at ¶ 27, quoting *State v. Letts*, 2d Dist. No. 15681 (June 22, 2001). Thus, "under Ohio's felony-murder statute, it is irrelevant whether the killer is the defendant, an accomplice, or a third party." *State v. Ford*, 10th Dist. No. 07AP-803, 2008-Ohio-4373, ¶ 32, citing *State v. Franklin*, 7th Dist. No. 06-MA-79, 2008-Ohio-2264, ¶ 111. Further, "purpose to kill is not an element of the crime and need not be proven," as "the mens rea for felony murder is the intent that is required to commit the underlying predicate offense." *State v. Maynard*, 10th Dist. No. 11AP-697, 2012-Ohio-2946, ¶ 17.

{¶ 77} Under Ohio law, a defendant can be held criminally responsible for a killing "regardless of the identity of * * * the person whose act directly caused the death, so long as the death is the 'proximate result' of Defendant's conduct in committing the underlying felony offense." *State v. Dixon,* 2d Dist. No. 18582 (Feb. 8, 2002). The Supreme Court has held that "[t]he offense of aggravated robbery, when committed with a loaded gun, is 'likely to produce death.' " *State v. Carter*, 72 Ohio St.3d 545, 554 (1995), quoting *State v. Widner*, 69 Ohio St.2d 267, 270 (1982). In this respect, Ohio courts have noted that, where a defendant is an active participant in an aggravated robbery, acting with knowledge that a firearm is involved, a resulting death of the victim is "a direct, natural, and reasonably foreseeable consequence of the aggravated robbery." *State v. Taylor,* 6th Dist. No. L-11-1202, 2013-Ohio-5182, ¶ 38. *See also State v. Jennings,* 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 51 (victim's death "was a reasonably foreseeable consequence of defendants' aggravated robbery offense regardless of which of the two defendants pulled the trigger").

{¶ 78} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that all the elements of complicity to commit aggravated

robbery and murder were proven beyond a reasonable doubt. We therefore find unpersuasive appellant's sufficiency challenge.

{¶ 79} Further, on review of the entire record, we cannot conclude the jury clearly lost its way and created a manifest miscarriage of justice such that the convictions must be reversed as against the manifest weight of the evidence. Here, the trier of fact could have reasonably found credible the testimony of R.V. and Officer Woods in concluding that appellant actively participated in a plan to rob R.D. of a weapon, and that R.D.'s death was the proximate result of the commission of the predicate offense of aggravated robbery. *See*, *e.g.*, *State v. Osman,* 4th Dist. No. 09CA36, 2011-Ohio-4626, ¶ 54 (jury did not clearly lose its way in concluding victim's death was a foreseeable result of aggravated robbery where appellant and co-conspirators went to victim's residence armed with guns to commit robbery); *Kimble* at ¶ 57 (convictions for complicity to aggravated robbery and murder not against the manifest weight of the evidence where testimony showed appellant "assisted knowingly in the planning of the robbery, which occurred with a gun and resulted in [victim] getting killed from a gunshot wound").

{¶ 80} Based on the foregoing, appellant's second and third assignments of error are not well-taken and are overruled.

{¶ 81} Under the fourth assignment of error, appellant asserts the trial court erred in failing to provide a jury instruction on the affirmative defense of abandonment. Appellant argues, as he did under his first assignment of error, there was sufficient evidence to consider his withdrawal/abandonment of complicity to commit the offenses.

{¶ 82} Crim.R. 30(A) governs instructions, and states in part: "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Where no objection is made as to the failure of a trial court to instruct on the affirmative defense of abandonment, "this issue must be reviewed under the plain error doctrine." *State v. Musgrave*, 5th Dist. No. 98CA10 (Apr. 24, 2000). Under Ohio law, "a trial court does not err in failing to instruct the jury on an affirmative defense where the evidence is insufficient to support the instruction." *State v. Reeves*, 12th Dist. No. CA2020-01-001, 2020-Ohio-5565, ¶ 14, citing *State v. Palmer*, 80 Ohio St.3d 543, 564 (1997); *State v. Davis*, 12th Dist. No. CA2015-05-015, 2016-Ohio-1166, ¶ 35.

{¶ 83} In previously addressing appellant's ineffective assistance of counsel claim, we noted the defense's theory of the case was that appellant, while aware of a plan to rob an unnamed individual of a check, was not aware the actual victim of the robbery was to be R.D. Defense counsel further argued at trial that appellant did not want to be involved in a murder. In rejecting appellant's claim that his counsel was ineffective in failing to request an instruction on abandonment, we observed that appellant's denial of involvement was inconsistent with a claim of abandonment. *See*, *e.g.*, *Fickenworth* at ¶ 15 (no error in failing to give instruction on abandonment where appellant "denied the conduct"); *State v. Adair*, 10th Dist. No. 86AP-23 (Nov. 18, 1986) (trial court did not err in failing to give instruction on abandonment where appellant's argument was "not that he abandoned his complicity," but rather that he "did not participate at all in the crime").

{¶ 84} In addressing that claim, we also cited testimony by Officer Woods (based on his interview with appellant) that appellant's statement telling Man-Man to "[h]old on" was in order to "look and make sure nobody was coming" (i.e., to avoid detection as opposed to a complete and voluntary renunciation of the crime). (Tr. Vol. III at 405-06.) Having rejected appellant's contention that his trial counsel was ineffective in failing to request a jury instruction on abandonment, we similarly find, in light of the defense's theory of the case and the evidence presented, no plain error by the trial court in failing to provide an instruction on abandonment.

{¶ 85} Appellant's fourth assignment of error is not well-taken and is overruled.

{¶ 86} Based on the foregoing, appellant's four assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

SADLER and KLATT, JJ., concur.

_____